Good morning, may it please the court. My name is Lee Roystacker and I represent California Highway Patrol Officer Leo Nava. My colleagues and I are trying to split our time up, our twenty minutes up, into six and a half minute segments. We all have different offices. Good luck. All I can tell you is it rarely succeeds. But we're going to try. My point is that I'm going to try to reserve a minute of my time for rebuttal. So my argument today necessarily has to be succinct and to the point. From the time my client arrived on the scene at the end of the pursuit until the incident was over, 30 seconds passed, no more than 30 seconds. And in that short period of time, the situation went from a disabled vehicle at the end of the pursuit, blocked in by a patrol car, to one where the suspect was using his two-ton truck essentially as a battering ram, going backwards and forward, ramming into a patrol car while officers were around on foot. In fact, he did escape and accelerated towards my client and a deputy, Deputy Ritchie. At that point, deadly force was unquestionably reasonable. He posed a serious risk of harm to the officers on foot, to Officer Nava and to Deputy Ritchie and anybody else in the vicinity. One of the things that the plaintiffs argue is that the officers sort of created that problem by not standing at a safe distance. Does that matter? It does not matter. Why doesn't it matter? The Fourth Amendment doesn't require the officers to back off, to retreat, to put themselves in a safe position. A bad tactic doesn't establish a Fourth Amendment violation. So can there ever be a situation where the danger that is the justification for the shooting is something that, because it's created by the officers' actions, doesn't matter for purposes of the Fourth Amendment? I suppose there is some potential hypothetical where that would work, but I don't think it matters in this situation. Not in this case. The car was essentially, everyone thought the car was disabled. Is it a little pickup? I'm sorry? The car, when you're talking about the car, isn't he driving a pickup? It's a truck. Okay, that would help me to keep it separate from the police cars. I don't know if I would describe it as little, but it's a truck. Anyway, it's a truck, not a car, and the police cars are cars. Dodge Ram? Dodge Ram. Yeah, so big truck. Correct. Okay, so everybody thought the truck was disabled. That's where you left off. Go ahead. Everyone thought the truck was disabled. There was one vehicle, bumper to bumper on it, and a fence behind it, and that's at the point where the truck started going back and forth, shifting gears, going back and forth, ramming into the car. Plum off, this court's decision in Wilkinson, a recent First Circuit decision in McGrath, and about 18 other circuit court cases we've cited in our briefs, in similar circumstances, all established that these facts, which are undisputed material facts, established that it's constitutional to use deadly force at that point. I don't really think that – I don't see a disputed fact that would – Can I just finish that sentence? Sure. I think your view is it's permissible to use deadly force because of the maneuvering that was happening with the truck, because that presents a risk of serious bodily injury to others, right? The maneuvering, the accelerating out with officers around on foot. Yes, correct. So just to make it full circle, since you have your six-and-a-half minutes to use, to get back to Judge Connelly's question, if the risk that justifies deadly force is the serious risk of – sorry, serious bodily injury or death to the other officers who are standing in the area, then doesn't it matter where they're standing, where they position themselves, if that's what creates the risk? Well, I would say it does matter where they're standing in terms of where they are in relation to the truck. I think the question was can they create the own – is it a problem if where they position themselves creates – Well, it's a little bit of a chicken and egg. You see where I'm going. But I would say this. I would say where they put themselves didn't create the danger, because if the car had just stopped and you had given up, the danger wouldn't have existed. But I thought one of the officers said that the reason he started shooting – at least one of them said the reason he started shooting is because of the officer standing in front of the car, and he thought he was going to get – or had been – or was going to get run over. I think – So how can you say it doesn't really matter where they were standing? My understanding is one of the officers said that because the car started to accelerate forward towards him. I thought your argument was that the officers are entitled under the Fourth Amendment not to retreat because they're trying to affect the arrest of the driver, and the only way to do that in this instance was to approach the vehicle on foot in the hope that they'd block the vehicle in, but in truth that had not occurred and the vehicle was still moving. That's correct. Okay. That's correct. Your six minutes are just about up. And I guess I would just add one quick comment. In 2006 – this happened in 2006 – the law was not clearly established in this area. Plumhoff established that it wasn't in 2004. There's three cases we cited in our papers – First Circuit, McGrath, Tenth Circuit, Thomas, and Cordova – that looked at conduct occurring in 2006 and said it wasn't clearly established. So I think either way the district court erred in denying qualified immunity to my client. Okay. Thank you. Thank you very much, Mr. Royce. Good morning, judges. Ricky Sanchez from the Office of County Counsel on behalf of the County of San Diego Deputies Taft and Ritchie. I'd like to start off by thanking the court for the time to review this matter, and we believe that the precedents of this court and the Supreme Court have provided guidance and training for competent use in the court below. The court below made some fundamental errors with respect to its analysis of this case. It decided that certain facts were material and therefore summary judgment could not be granted to the defendant deputies. One of the items is that the truck didn't actually hit Deputy Taft, but rather as it was heading towards her, it passed her within one foot. That is in and of itself an illogical statement to make with respect to the decision to use deadly force in response to trying to stop a threat of serious bodily injury or death. Was she down on one knee at that point? She was. She had fallen onto the street at the time that the truck was accelerating towards her. Well, wait a minute. But at the time she shot, wasn't she back up on her feet? No, she was not. Okay. So it seems to me there's, in her case in particular, there's the perceived threat because she was down. She had fallen immediately upon getting out of her car and she saw the truck trying to get free and then coming at her, right? And then I think just to be so you can fairly respond to opposing counsel's argument, their position is by the time the truck came to her, it came abreast of her, was going to miss her, albeit closely, so that when she was actually shooting, it wasn't coming towards her, it was passing her. That's their argument. I don't think that the argument in that respect holds water in the sense that with respect to her discharge of the weapon, she commenced fire as the truck was coming at her. The fact that she continued to fire even after the truck had passed, as they would argue, does not make her decision to use deadly force unconstitutional. When you say that Officer Taft began to shoot when the truck was still coming towards her as opposed to as it was passing her, is that consistent with Firestone's report? Firestone indicates nothing in that respect. I think that it's more mulligan, Erin. Gold is the one that actually was questioned by defense counsel as to a hypothetical as to what could account for several holes in the driver's side of the vehicle. With respect to your Honor's question about placing an individual or an officer's position relative to a threat and whether or not that could give rise to a constitutional claim, I think Billington answers that question quite straightforwardly. Billington, Duran, Follow, Alexander versus the County of San Francisco. The rule that this circuit has established with respect to that is that a tactical error, if one could even be considered that under these circumstances, does not give rise to a constitutional claim unless you can find that the conduct of the officer with respect to the tactic itself was unconstitutional and would reasonably be expected to provoke a violent response on the part of the suspect. None of those elements can be satisfied with respect to this particular case. I know that in their brief, the plaintiffs spent a great deal of time attacking the character of Deputy Ritchie. As we pointed out in our reply brief, the one case that Deputy Ritchie was involved in, not this one, it was taken to trial and there was a defense verdict on his behalf with respect to his use of deadly force. That's not even a matter that should be considered as a basis for liability as against him or the County of San Diego, particularly since they are seeking to impose 14th Amendment purpose to harm liability upon Deputy Ritchie. Furthermore, with respect to the court's assessment of liability in this case, going along with the plaintiff's contention that Deputy Ritchie should not have even joined into this pursuit, there is no constitutional right that I'm aware of that exists on the part of a suspect that would prevent an agency into whom's jurisdiction a pursuit is entering is prohibited from joining into the pursuit in order to attempt to stop the pursuit and take the person into custody, which is all that Deputy Ritchie did in connection with this case with respect to his attempt to deploy a spike strip to disable the vehicle. Well, didn't he also drive down the wrong side of the freeway without his lights on? He did. And again, the question to ask, is that a constitutional violation that is vested in the suspect himself? It's a separate question, but when you make a comment, when you say that's all Officer Ritchie did, it sort of begs a response. That's my only point. I know you're not Officer Nava's lawyer and I didn't get a chance to ask this question while your co-counsel was up, but there was at least some indication, I think it came from the plaintiff's expert and maybe from one of the other officers, Martin I think is the one that drove up along to the side of the car, that there was shooting before, shooting started happening before the truck broke free. Actually, I don't think that I'm familiar with that evidence. I do know that Deputy... Well, Martin said he heard gunfire immediately after he had pulled up to the side of the car, which suggests that that's before the car broke free. One would be able to possibly make that inference, except that Officer Martin was inside of his car, he had bent down and was trying to kick open the door. Let me ask you this. If there's evidence that there was shooting before the truck had broken free, does that matter? In this particular case, it would not. Why? Because the question is the definition of breaking through. We do know that the unequivocal, undisputed material fact is that the shooting didn't actually start until after the truck had moved, had rammed itself into Deputy Ritchie's patrol car. He's jacking back and forth. Back and forth in order to destroy that barricade and that Deputy... So that activity enough you think would be enough to justify the shooting? With respect to the proximity of the deputies and the CHP officers outside of a two-and-a-half-ton Dodge Ram pickup truck, yes. Is that what they were? It was, and I think it was a four-wheel drive, so it was really high. And the excerpts of record that we provided to the court actually show you photographs of the vehicle and the underside of the front of the vehicle that was damaged as a result of using the vehicle as a battering ram in order to remove the blockade, and I'm confident that I am past the six minutes and I believe... I have two questions that may... And I have one, too. With a difference. One is how many patrol cars in total were damaged during this pursuit? Actually damaged? I think two vehicles were disabled during the pursuit. Well, I consider that damage, so they were taken out of service, right? Yes. And the vehicle driven by Officer Martin, when he pitted the truck twice incidentally, the first time successful to get him onto the shoulder, but he broke away anyway, and then the second time where he ended up on the east side of the 101 shoulder. So that's Deputy Ritchie's vehicle. At least four. Pardon me? At least four. Yes, at least four vehicles. And then the next question is, is there any testimony in the record as to what the various agencies could hear on their radios as the chase was proceeding? Did they switch to some kind of a mutual aid radio channel, or were they relying on their dispatchers to relay information from dispatchers of the other agencies? We do know that the CHP in the northern district of San Diego or in the northern county portion, there are different frequencies that are used by different agencies in connection with their law enforcement activities. With respect to the call that was made by the CHP officer who perceived that the suspect had attempted to strike Deputy Ritchie when he first attempted to deploy spike strips, that was not a transmission that could be heard by Deputy Ritchie on the sheriff's dispatching unit. That was Officer Fenton's call, right? Pardon me? Was that Officer Fenton's call? I believe it was Officer Fenton's call. Okay. And then how about as the chase progressed, was there any effort to relay information from one agency to another? Did anybody have scanners in their police cars? I'm not sure about scanners, Your Honor, but I do understand that various persons who were involved in the pursuit, and depending on what channel that they had switched to, had actually heard that, for instance, Deputy Nava, not Nava, Deputy Yavo, had gone south and was attempting to set up another spike strip, which also was unsuccessful. So there had to be some sort of communication, but I cannot say and represent to the court that it was a unified frequency. Let me ask specifically then with regard to the broadcast of an assault on an officer, the 245 call, who was able to hear that? As I understand it, that was put out by a CHP officer initially. It was. And I know that my two deputies who are defendants in this action did not hear it. Did not hear that. Okay. Those were my two. You had one? I can save mine first. All right. Thank you. Good morning, Your Honors. Deputy Attorney General Michael Kayyaban on behalf of California, Highway Patrol Officer Timothy Fenton. Your Honors, the most important factor in evaluating whether or not an officer's use of lethal force is appropriate or constitutionally permissible is whether or not the suspects or the suspect posed an immediate threat of death to another person. And in this case, Officer Fenton arrived on scene. He was in the vehicle that was operated by Officer Martin. They performed the last pit maneuver, continued driving north, and approached the suspect's vehicle from the north. As they approached, Officer Fenton saw a deputy standing in the roadway exposed, and he saw the pickup truck ramming into the patrol vehicle in front of it. As Officer Fenton got out of his vehicle, he saw that pickup truck breaking free from its position and traveling into the roadway and through the area where he last saw the deputy standing. Under the cases of Plumhoff and Wilkinson v. Torres from this circuit, that's an objectively reasonable use of force because any reasonable officer faced with those circumstances would recognize that the deputy's life is in danger. Your Honor, Judge Keneally, you asked whether or not it would make a difference, I believe, if the truck had broken free. I would respond by pointing the court to the Plumhoff case. In that case, the suspect's vehicle was trying to break free. It had not yet broken free. The Supreme Court found that the officers were entitled to qualified immunity, even though some of those shots were fired before the vehicle had broken free from its position. The court also had questions regarding the assault on an officer report that was made by Officer Fenton. Well before the shooting incident, I would first argue that I think those facts are immaterial to whether or not the use of force, which occurred much later, was objectively reasonable. However, I'd also like to point the court to evidence that- Counsel, just forgive me for interrupting, but I don't think you can have it both ways. If you're going to talk about Plumhoff and about the other officers reasonably fearing that an officer's life had been placed in danger then, that radio call that Officers Fenton made matters. And of course, opposing counsel is going to tell us, because it's in the briefing, as you know, that Officer Ritchie testified that he didn't feel that his life had been placed in danger earlier. So do you want to respond to that since you have the microphone now? I would, Your Honor. The undisputed facts, regardless of how that incident is characterized, the undisputed facts establish that Deputy Ritchie saw the pickup truck turning in his direction and he was forced to scramble to gain cover. So now you're back to- at the end game. So I'm back to the 245 call. Okay, so at the spike incident, I don't think that's right. I think Officer Ritchie testified after the fact that he hadn't felt that that had been an assault on a police officer. Did I get that wrong? I think you got that wrong because in his deposition testimony, I can point the court to Deputy Ritchie's- I've got it right here. In the Fenton excerpt of record, he testified at pages 237 and 477. I think 477 is his deposition testimony. He testified that from his perspective, he didn't think Mr. Medina made an intentional move, but he acknowledged that an officer riding behind Mr. Medina's truck may have interpreted it differently and may have been correct. And we know from the testimony of Officer Sebron and Officer Martin, who were riding in vehicles behind Mr. Medina's truck, that they interpreted that move as an unnecessary driving move directed at the deputy who was deploying the spike strip. Okay, but Officer Ritchie didn't think so. He would have been the subject of the assault and he didn't feel that it had been. And in fact, there was a maneuver to avoid Officer Ritchie. It just seems to me that you can't have it both ways, and maybe we're going down a cul-de-sac that doesn't matter too much because you're really focusing on the end game. Well, let me ask the question a different way, and it's a different 245 call. Were there CHP officers involved in the shooting who had heard the earlier 245 report from Officer Fenton? I believe Officer Nava did hear the call. Okay. Of course- So it was within at least the collective knowledge of some of the officers who discharged their weapons that night. At least one other officer, Officer Nava. That's the plaintiff's point. That's the plaintiff's point, that this sort of adds to the frenzy or encourages the tragic ending in this case, and it's a very tragic case, as we all know. Could you answer this question for me? Nobody seems to admit to being the first person to shoot. Everybody heard somebody else shoot first. I can tell you from Officer Fenton's perspective, he's the officer who got out of his vehicle, and the record establishes, based on Mr. Firestone's testimony, that Officer Fenton fired his weapon for the first time after the pickup truck had entered onto the roadway. He testified that the front two tires of the truck had to be on the roadway. He clearly wasn't the first, is what you're saying? Officer Fenton was. It looks like I'm already beyond my time. Thank you. Okay. I think they saved a minute. They did better than I thought they would do. I think they did. Yeah. May it please the Court, Elaine Heine appearing for Arlene and Robert Medina, the parents of the deceased. I'd like to make the point in this case that the facts need to be looked at in the light that's favorable to the plaintiff in this case. And in doing so, we must consider the testimony and the declaration of the forensic expert, Mark Firestone, who clearly says that prior to the truck breaking out of confinement, three shots were fired by Nava, Officer Nava, and at least he believes seven shots were fired by Deputy Ritchie prior to the breaking out of the confinement. And so can I stop you there? Because I think this is important, and maybe you could help me. I think Firestone's report indicates that Officer Ritchie fired into the tires on the passenger side of the truck. Is that right? That's what the tires were never examined post the factual scenario. They were examined. This is your expert. Yes, my expert was basing his examination of the situation on what was reported by the officers and their investigators. But the officers and their investigators never actually looked at the tires to see if the tires were shot out. Okay, but it's your investigator, and that's what I'm working with. Right. Because it really matters to your case where Officer Ritchie had positioned himself, right? Correct. Okay. So by your expert report, because I think you're right, all the facts have to be viewed in the light most favorable to your client, Officer Ritchie managed to maneuver around, walk around, I guess, you know, the truck and fired into the passenger side tires. He was placed himself in front of the truck and fired several shots straight on through the – basically through the windshield or head on. And then when the truck broke free, he was on the driver's side of the truck. Correct. And shot some more. If you believe Officer Ritchie's testimony, which is not entirely believable in this case because no other officer who testified in this case saw him on the passenger side of the truck. That's so important. That's why that's so important for me because it's – I agree with you. I looked carefully at this case. I want your clients to know that, very carefully, as I'm sure my colleagues did. And we're very mindful how important this is to you all. So there's inconsistency about where Officer Ritchie was and when he disappeared, or seemingly. Of course, it was dark. Whether the other officers reasonably believed he'd been run over, basically. So it's very important to me that it is Plaintiff's expert report that puts those shots into the passenger side tires. So can you give me your best response to that concern? And, Your Honor, my response to that would be Officer Ritchie was never at the passenger side. He was in front of the vehicle. There's no evidence that he shot any of his seven shots anywhere but the front of the vehicle. And those seven shots went into the front of the vehicle as he was moving to the driver's side. We can review. Ms. Heim, is there no notation in any of the agency reports of the shooting to tell us which tires were shot out on this truck? There was notation that the front and the rear tire were shot out of the truck by – But which side of the truck? That was on the passenger side. Okay, so we know that those tires were shot out, and the only testimony that we have as to who shot at tires was Deputy Ritchie. So don't we have to conclude from that that at some point he was on the passenger side of the truck? Were you about to say that nobody actually looked at the tires, that the evidence is just the testimony about or the statements about where they shot? Exactly. And Dr. Firestone states that Mark Ritchie's account of events is impossible. The ballistic evidence places Deputy Ritchie in front of the truck when he began shooting and then moving south. And that's the evidence that we are asking the court to rely upon in this particular case. You're going to help me with this, because somebody shot the tires out on the passenger side, right? Well, that's not conclusively proven, is my point. Were the tires shot out on the passenger side or not? And all the agencies who investigated this incident, nobody made a report, a note in their report as to which tires were shot out? If you look at the last page of Dr. Firestone's declaration, which is ER 933. That's not my question. My question is, is there any evidence in this record from any other source besides Dr. Firestone as to which tires were shot out? No evidence other than testimony. Well, that's evidence. And the testimony is Deputy Ritchie's testimony, which is not believable in this case because no other witness ever saw them. But you don't have any testimony other than we don't believe Ritchie to dispute the testimony that the passenger tires were shot out. Do you? Because an improper investigation occurred. Sounds like it to me, but that's not the issue. The issue is, what proof do you have to show that it was not the passenger tires that were shot out? Well, the tires appeared flat, but that does not prove that they were, in fact, shot out. Were all four tires flat or just two? I believe the two tires on the passenger side were flat. Okay, so let's say that Ritchie didn't shoot out the passenger tires just for hypothetical purposes and was in front of the car when he was shooting, which is what your expert said. Tell me how that helps you, that he was in front of the car. Because if the car is going to get out, it's going to get out going forward, right? It's not going to get out going behind because there's a fence there. It was completely contained when the shooting began. And when the officers exited their car, they were not afraid. Hang on a second. It wasn't completely contained because we know it got out, right? We did. We do know it got out, but it got out after the fact. It got out after seven shots were fired into the front passenger window. So how does it help you that Officer Ritchie was in front of the truck when he was shooting? To the extent that he was not afraid at that point of any sort of imminent danger to his person. He wouldn't have exited his vehicle. Why does it matter whether he was afraid or not? The question is whether objectively it would be reasonable for somebody to think he was in danger. Let me just tell you where I'm coming from. So you've got this car that's penned in on the back. It's penned in on the side and there's something in front of it. And it's then rocking back and forth in an apparent effort to get out. And you've got an officer right in front of the car. You know it can't get out to the back because there's a fence. It's likely if it's going back and forth and it can't get out to the back, the only way it's going to get out is going forward. In other words, right towards the person who's standing there. So why wouldn't that make it objectively reasonable for other officers, including that officer, to think that he might be in danger? Well, Your Honor, the district court felt that those officers could have moved. NAVA testified he was not in fear for his safety or the safety of Deputy Ritchie at the point when they exited the vehicle. Did they have to move, though? That was the question I think I asked somebody on the other side. Did they have to move? Did they have to move? Right. Ritchie did, in fact, move. He, in fact, moved out of the way when the car went forward. Oh, he moved out of the way to avoid getting hit. Right. But when other officers are sitting there watching him, he's in front of the vehicle. Is there some case or cases that say that if the danger that's perceived by the other officers is created by an officer standing in a place that turns out to be dangerous, that that gives you a Fourth Amendment claim? He stood in front of the vehicle because he did not have – there was no objective fear that he would be injured at that point.  Nava testified that when he exited the vehicle, he had no fear for his safety or Ritchie's safety because the vehicle was completely contained at that point. Okay. You keep saying at that point. Could you help me? That's when Nava exited. And then the truck maneuvered back and forth and back and forth and bashed, basically, the police car and I think moved it about six inches per bash. Right. In order to make enough opening that it then escaped. Is that a fair summary? Yes. Okay. How many times did it go back and forth? Did we know how long that took? It wasn't a point in time. There was testimony from Deputy Barrios, or I think he's CHB, that it was at least seven times. Okay. So did anybody testify about how long that took? One minute? Two minutes? Not to my recollection as I stand here today. I'm sure it's in the record somewhere. However, it was seven times back and forth. It was enough time for Deputy Fenton and Martin to go up north the block, make a U-turn, come back, box the truck in. So there was time to deliberate. There was time to think about what was going on in this particular case. And prior to doing anything else, the deputies shot at the vehicle while it was contained before there was any threat of imminent danger to any deputies standing around the vehicles. Okay. That's why they had exited. I'm looking at ERO, or maybe it's ER, 0150, which is, to say in fairness, this is the photograph Judge Holman and I are looking at. It's in the record. And this shows a pickup with two flat tires. Is there any other evidence that you're referring to? Well, I would point to Firesan's report once again. He's the expert in this case, that there was a failure to inspect and verify the tires had been shot, as Deputy Ritchie claims, but no other officer or deputy collaborates. Okay. So they're flat, and we don't know why they're flat. Correct. Is that right? Okay. Never examined. And those are the only tires on the truck that are flat. To the best of my knowledge. There's another picture that shows the other side of the truck, and the tires look just fine. And those are attachments to Firesan's report. Are you saying that the driver's side tires look just fine? No. Oh, yes, driver's side tire. Okay. Yeah. So it's my understanding from looking at the photographs, looking at the evidence, that the tires, yes, were flat. We don't know what from. So then the only question is, since Ritchie says, I shot them, what other testimony do we have to suggest that somebody else flattened those tires? We don't know how those tires became flat. Could they have flattened flat from going over the, yes. Yeah, exactly. There could have been any point in this trip, 30-minute trip down the coast, avoiding multiple spike strips or running them over. I thought they successfully avoided spike strips on four occasions, and they had to employ five pit maneuvers to try and get them stopped. And certainly within one of those incidents, the tires could have become flat. But none of the pursuing officers testified that the spike strips worked. Nobody reported seeing the vehicle disabled in any way until it was pushed into the fence. I understand that, Your Honor, but also no other officer testified. We're looking for material facts that are in dispute, and you don't have any evidence to dispute those facts. Well, we do have evidence to dispute the tires were flattened by Ritchie because no other officer saw Ritchie shoot at those tires. No other officer saw Ritchie. I understand your argument. It relies on your ability to impeach Deputy Ritchie, not that you have other evidence that directly refutes what he says. We do, Your Honor, and that's the circumstantial evidence, and that's as the casings as looked at by Dr. Fireson, which proves that the truck was fired upon prior to breaking out of confinement, prior to anybody testifying or the reasonable officer. If you successfully evaded four spike strips and five pit maneuvers, what's wrong with an officer employing his weapon to shoot the tires out in an attempt to end the chase? There is, in my personal opinion, that could have happened, but there's no evidence that it did happen. There's testimony from Ritchie that he did it. You keep saying there's no evidence, but there is evidence. Well, Ritchie's credibility is at issue in this case. I understand all that, but I'm looking for facts. I'm looking for something that creates a material issue of fact that refutes the physical evidence, which is that the tires on the right side of the truck are flat, and Deputy Ritchie says, I shot each of those tires out. And if those tires were, in fact, flat, that's a pretty good indication that truck was not going to be heading toward. Not if it's a four-wheel drive, two-and-a-half-ton Dodge Ram Charger, it doesn't. And your client continued to rock the vehicle back and forth, apparently with two flat tires. That didn't seem to be slowing him down. It didn't seem to be slowing him down from attempting to escape, but it certainly prevented him from escaping. Let me ask you this. Wait, wait, wait, wait, wait. Did it prevent him from escaping? He escaped. I don't understand this. You know, and I am mindful, this man was a Marine. He's a decedent. This is a terrible tragedy. Everyone agrees with that, so I don't want that to get lost. But we have to apply the law, and I really am having a hard time understanding this last point that you're making, that the truck, which I understand to be that the truck was contained and that there wasn't a risk that it would escape because it escaped. It did escape, and it escaped after our client was shot, and we don't know how it escaped, whether he was leaning on the gas pedal or how that happened. But he was shot. The fact remains that there is evidence presented to the court today that he was shot before he broke out of containment. But I think the point is, is that if what you're relying on is the fact that the truck was penned in and couldn't break free, the fact that it did break free means you're wrong, that it could have broken free,  But it does not warrant the use of deadly force. As the district court said, it warranted perhaps moving out of the way. And I do need to defer some time to my counsel. What should they have done? Not that we play money-money quarterback. We're not police officers. But what should they have done? They should have used other means of subduing the suspect. What other means? They tried spike strips. Moving out of the way and letting the … They shot the tires out. What else should they have done? If they did shoot the tires out and they moved out of the way, the truck wouldn't have gone very far and they could have certainly apprehended Mr. Medina. We don't know that. I mean, we know that the truck was able to break free. Deadly force was not warranted. You don't know how far that truck could have gone on two flat tires. I mean, you can run a car on its rims if you want to destroy the rims. And there were no civilians in the area. It was 2 o'clock in the morning. At the time that the bars closed at 2 o'clock on a Thursday morning near a major marine base and in a populated area. And your position is that there's no other living soul on the stream? There was no other living soul and there's no evidence. There were a lot of policemen around. There was a lot of policemen around. And I think they're living souls. Yes, Your Honor, but he was not wanted on any sort of felony charges. He was weaving within his lane. It was a 30-minute speech. He was wanted on felony charges, was he not? He's basically felony eluding from the point where he refuses to yield to the first CHP unit that tried to stop him to investigate him for DUI. Yes, for a suspected DUI, Your Honor. And felony eluding. And there is no evidence that he's armed in any way, shape, or form. He's got a 2.5-ton vehicle, which he is using as a battering ram. That isn't a deadly weapon. I don't know what is. And, Your Honor, I do need to defer some time to my counsel here. Thank you. If it pleases the Court, Dina Acosta on behalf of Jennifer Medina. And I've listened to the Court's questions. One of the things I really... Jennifer Medina's claim is that this was a preemptive strike, not a protective strike in the use of deadly force. And the officers escalated the situation instead of de-escalating it. And one of the issues I'd like to address is our experts' analysis. There seemed to be some indication that the tires were shot out because there was a casing that was found. There is a conundrum because none of the testimony of the officers supports Deputy Ritchie's account. And these are officers that are arriving contemporaneously on the scene. Why does it matter whether Detective or Officer Ritchie went to the passenger side and shot out the tires? Because according to his account to the investigators, he took the time to deliberate. He was at the passenger side. He elected not to use his baton. Time to deliberate to do what? He's deliberating to effect the arrest of the driver who is refusing to surrender. Isn't that a legitimate law enforcement objective? To apprehend the suspect? To effect the arrest of the driver, yes. To arrest the suspect. But not by lethal force? So, ma'am, this fact that comes from your expert report is the one I'm focusing on because I think this cuts in favor of the other team, and that's what I'm trying to get you to focus on. If Officer Ritchie went to the passenger side so he's not in danger of being hit and he's taking time to deliberate, which is your position, and he shot at the tires, he's not using lethal force. He's trying to disable the vehicle. So what's your response to that? Correct. That's what he was initially trying to do. So you're not taking exception to those shots? That's okay? Well, it's a tactical error, I believe, and they changed their policy on that effect, but he didn't shoot at Corporal Medina at that point in time. Okay. So when you said that your position is that the officers acted in a way that escalated the situation, it sounds like you're not really focusing on that segment, which is where Officer Ritchie was trying to shoot out the tires, but you're more concerned about when he went to the front of the vehicle. Is that fair? Actually, not really, Your Honor. Okay. I believe by shooting out the tires when you have that many officers and deputies on the scene, I think what that really created was a reflexive situation where you had other officers firing, not because they wanted to protect Deputy Ritchie, who is depending on which officer you believe depends on where he was placed. Obviously, we had to hire a ballistics expert to perform a trajectory analysis that the law enforcement agency that was tasked with the investigation chose not to do purposely. Okay. So maybe it's this. Maybe you know something we don't know about the following. When the truck came to rest, where it came to rest initially, was there ever a period of time where it was sitting before it started ramming back and forth? There's conflicting testimony on that. Certain officers contend that it, with great force, hit Deputy Ritchie's vehicle twice and then broke out. Deputy Berrios, who was on the driver's side of the truck, testified that. And actually, Deputy Taft described it this way, too, that it was wedging its way out. I'm asking something different. If you could, the truck came to rest where it came to rest with its back to the fence, and it was pinned in. Was there ever a period of time before anybody started shooting where the truck was sitting? In other words, is it your theory that—I'm trying to follow your theory. Is it your theory that once the shots started and then the truck started to ram back and forth to escape? Or what did they do to escalate so that the truck started to do those maneuvers to escape? I wouldn't say that their actions caused the escalation of the truck's movement. It was the escalation of the dangerousness of the pursuit by the tactics that were used. And then at the time that it was contained, by shooting at the tires, and you've got other officers in close proximity, which, by the way, never see Ritchie on the passenger side. It's irreconcilable, some of the accounts of the officers. Can I go back to Judge Christian's question, because I think it's important to me, too? So once the truck is pinned up against the fence and the vehicle's in front of it, and the other vehicle comes up to the side, was there ever a period of time that it was just paused sitting there before he started moving back and forth? According to our expert, it appears to be because there's no scrape marks on the side of the passenger door. So when Officer Martin comes in with his push bars and blocks it in from the north— It was touching. Ritchie was touching. So there would be scrape marks laterally is what you're saying. Correct. So an officer, Martin, testified that he put his push bar up against the passenger door, that he could look through the passenger window and see Medina, and basically the shooting started immediately because he leaned down, he didn't see anything, because he was trying to kick open his door. But it sounds from his testimony the shooting was simultaneous with him putting the push bars up against the passenger door, and there's no scrape marks on the side of the truck. This is a very tough case for you once the truck starts doing that maneuver. Very tough case. Correct. That's why I'm trying to figure out if your theory is that there's something the officers did or didn't do that prompted Mr. Medina to be maneuvering his truck that way. Do you have a response to that? I think there's—we have to concede that Corporal Medina was intent on— On fleeing. It's a matter of whether the officers' use of force in the situation was reasonable when they had the time to deliberate and use a different, lesser level of force to apprehend him. I guess I'll ask the same question that we asked of your co-counsel. What more would you have had the officers do? What other tactics should they have employed? Well, if you believe Deputy Ritchie, there was time for him to take out his baton and either use a taser or pepper spray, but he chose not to. He chose to use his weapon to shoot out the tires instead. You have Deputy Barrios that's at the driver's side door that could have done the same thing. Were the windows open? The passenger side window is halfway down. Officer Ritchie said that he looked in the passenger window. I just didn't know if it was open or not because he could see that the decedent was not armed. And so could Deputy Barrios. Nobody believed that he was armed. Was the driver's side window open? Deputy Barrios wasn't clear on whether it was or not, best my recollection, but he could see him. And what did the toxicology report show? That showed, according to the toxicologist, high levels of cocaine. I thought it said near fatal. That is in dispute because also if you read their toxicologist report, it also states that you cannot determine objectively what somebody's reaction is going to be because cocaine, unlike alcohol or other drugs, cocaine is very individually specific on what it will cause someone to do. But the driver here is clearly under the influence, right? And so the initial reason for the stop was a legitimate DUI investigation. And the officers, because they were attempting to pull him over for a DUI, would have assumed that he was impaired and you would think would use appropriate tactics of which they're trained. Well, if he had yielded to the red lights and siren, but he didn't. The problem is he brought this on himself by continuing to run. In some respects, but law enforcement also has a duty to protect suspects. And if the law is that you get to shoot every suspected DUI suspect. But it isn't. That's not the law. So can you just help me? Did plaintiffs put out any expert evidence that with the windows positioned the way you've indicated, the passenger window partially opened, that it would have been feasible to use a baton or a taser? Is there any evidence of that? No, other than Deputy Ritchie basically stating that he had the opportunity to do that and chose not to. Where does he say that, please? As in his interview to the investigators. I don't have the exact site to the record. All right. He had one of those metal things that you can use to break a window, right? Well, he said he had a baton and he thought about using the baton. But we don't know what kind of a baton. It could have been a wood baton. It could have been a plastic baton. It could have been a steel baton, a collapsible one. We don't know. That's correct. But with the window halfway down, he also could have just used a taser or pepper spray. Hence my question. Do we have any evidence that either of those, anything else, would have been viable? Because that's your position. Your position is at that point, even though the truck was doing that maneuver, they didn't need to use deadly force. So in response to our repeated questions about what should they have done, where do I look? Because I'm going to go back and reread. Is it Officer Ritchie's testimony that you want me to look at? Yes. And it's the interview the day of or an immediate aftermath? Correct. All right. Thank you. Thank you very much. I think you had a couple of minutes, Counsel. Just one very brief point. Just to make clear, the plaintiffs have always taken the position from the time of the initial pleadings through the underlying briefing and even their expert fire stone that no shots were fired before the truck was moving back and forth. Okay. So is that place where they've actually affirmatively taken that position where you can point us in the record to that? It is in my briefing, but I will defer my time and pull those sites. Okay. Just tell me what color of brief cover. It would be our opening brief and in our reply brief. That's right. I've got clerks who can do that. I'm going to find it. Yeah. I mean, in the complaint, they said the shots were fired when he was moving back and forth. They conceded that position in their underlying opposition to the summary judgment, and that's because their expert says that's what happened. He says Nava shot while Nava and Ritchie were in front of the truck as it was moving back and forth, at least the first couple shots, but we know it broke three, and then there were additional shots. But it seems to me that your side wants to say those weren't the first shots, and viewing not that we do this, but if we were to look at your theory, the facts your way, is that Ritchie went around to the passenger side and first tried to shoot out the tires. I think he did. But we have two. So when you say first shots, your theory is that those were the first shots. I'm talking first shots from my client at least. Nava. Nava, correct. I think the issue with Ritchie is that he did at some point shoot out the tires. He testified to that. But he also testified that in this very dynamic situation, he found himself back in a different spot, which was in front of the truck. Did he say whether he shot the tires while the car was moving as opposed to when it was stationary? I don't recall exactly what he said in terms of whether the car was moving or not when he shot the tires. Is it the sequence in the test where he's talking about which way the wheels pointed? Is it that sequence? I don't think so, because I think at that point where the sequence, whether the wheels were turned to the left or to the right, I think he would have had necessarily been in front. But I could be wrong. But I'm not sure any of that is altogether a materially disputed fact, because the facts are this truck was attempting to break free when the shots were fired, and it did break free, and it came at officers who are no match for this truck. Thank you. Okay. The case just argued is submitted, and we'll go back and look at the record again and get you an answer as soon as we can. Thank you. Thank you all. Thank you.
judges: Tallman, Christen, Kennelly